# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### SEPTEMBER SESSION, 1997

**FILED**

January 7, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9610-CR-00421** |
| | ) | |
| Appellee, | ) | |
| | ) | **SUMNER COUNTY** |
| | ) | |
| **V.** | ) | |
| | ) | **HON. JANE WHEATCRAFT, JUDGE** |
| **GEROME J. SMITH,** | ) | |
| | ) | |
| Appellant. | ) | **(FIRST DEGREE MURDER)** |

**FOR THE APPELLANT:**

**LIONEL R. BARRETT**
Washington Square Two
Suite 417
222 Second Avenue, North
Nashville, TN 37201

**FOR THE APPELLEE:**

**JOHN KNOX WALKUP**
Attorney General & Reporter

**LISA A. NAYLOR**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243

**VICTOR S. JOHNSON**
District Attorney General Pro Tem

**KYMBERLY HAAS**
Assistant District Attorney General

**SHARON BROX**
Assistant District Attorney General
Washington Square Two
Suite 500
222 Second Avenue, North
Nashville, TN 37201

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Gerome J. Smith, appeals as of right from a conviction of first degree murder following a jury trial in the Sumner County Criminal Court. Defendant was subsequently sentenced to life imprisonment. In this appeal, Defendant argues that the evidence is insufficient as a matter of law to allow a rational trier of fact to conclude that the Defendant committed premeditated first-degree murder. We affirm the judgment of the trial court.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court

reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

The State presented several witnesses during its case-in-chief. Benny K. Adams, a police officer with the Gallatin Police Department, was on duty on February 23, 1995. Earlier in the evening, shots had been fired in the area of Blakemore Street in Gallatin, and he responded to that call from the police dispatcher. He was on Red River Road in Gallatin, in front of the street known as South Blakemore, at 1:02 a.m. when he heard more shots fired. When asked to describe the shots, Adams testified that he heard several direct shots apparently coming from a semi-automatic, small caliber weapon. Immediately prior to hearing the second set of shots, Adams had seen a white Cougar turn off Red River Road onto Blakemore. When he drove closer to investigate, he saw the car turn off onto West Eastland and observed a black male run inside a nearby house belonging to Bailey Turner.

Adams and another officer went to Bailey Turner's house to further investigate. The driver of the white Cougar gave Adams permission to search his vehicle, but no weapons were found. While they were at Turner's house, they heard another relay of shots fired. The shots sounded as if they came from the Brook's Alley area, but Adams did not go to investigate as he was still on the scene at Blakemore. Adams recalled that he heard between six to eight shots fired this time from a semi-automatic, small caliber weapon.

Jerry Lee Hickman, also an officer with the Gallatin Police Department, testified that he was assigned to the Brook's Alley area of Gallatin and was on duty on February 23, 1995. He received a "shots-fired" call at 12:25 a.m., and drove into that area. Several people he spoke to in Brook's Alley said that they had seen a couple of guys running and shooting at each other. Hickman remained in that general area until he heard a sequence of shots. There were six (6) to eight (8) shots, one right after another. He drove to Church Street, which parallels Brook's Alley, and parked. A man came across the street and told him that someone had shot into his house. Hickman went inside the man's house and saw a place on the bathtub where the enamel had been knocked off. After completing a search of the house and the immediate area surrounding the house, Hickman left. He was later called back to Brook's Alley to help with an ongoing investigation. When he got there, he saw the body of Chuckie Vaughn, the victim, lying beside the house he had earlier searched. Hickman helped to secure the area. During his investigation, he saw a shotgun lying to the right side of the victim along with some unfired shotgun shells.

Ronald Parker, shift commander at the Gallatin Police Department, was also on duty on February 23, 1995, when he responded to a call that shots had been fired in the area of South Blakemore at approximately 11:04 p.m. There was another report of shots fired at 12:25 a.m., and again at 1:02 a.m. At the occurrence of shots at 1:02 a.m., Parker heard eight (8) to twelve (12) shots being fired in rapid succession, probably from a .22 caliber weapon. He and other officers began searching in that area for the source of the shots, and a man came out of his house on Church Street and said that someone had shot into his house. Parker returned to the area at approximately 6:15 a.m. and secured the

scene where the victim's body had been found. He also secured a single-shot shotgun lying beside the victim's body. One (1) shell was found in the gun and two (2) other shells were lying underneath the victim's body. The shotgun was in a loaded position, cocked and ready to be fired. Parker recalled that during the early morning hours when he had heard gunshots, he never heard the sound of a shotgun being fired. Parker also found some empty .22 shell casings across the alley.

Edward Hesson was a patrol officer at the time the victim's body was found. He was dispatched to the general area of Brook's Alley because of several complaint calls of shots fired in the area. He prepared a diagram of the scene where the victim's body was found. Upon first arriving at the scene, he saw the body of the victim. There was no evidence in the immediate area of the victim that a shotgun had been fired, but .22 caliber shell casings were discovered within a thirty (30) feet area next to the victim. Hesson did not see any signs of a struggle. He noted in his diagram that there were some trees in the area, but he did not note the small shrubbery there. However, Hesson described the shrubbery in his testimony as full, such that someone could possibly have hidden behind it.

Kenneth Fitts, a resident of Gallatin, testified that he grew up with the victim. On February 23, 1995, he was residing at 145 South Blakemore, located approximately fifty (50) to seventy-five (75) feet from where the victim's body was found. At approximately 12:30 a.m., Fitts heard some shots fired in the neighborhood. The shots sounded like they came from the area of 222 South Blakemore. Five minutes later, the victim arrived at Fitts' home, out of breath,

scared and holding a shotgun. Fitts begged the victim not to leave, but the victim left about five (5) minutes after he had arrived.

Sherita Bennett had known the Defendant all of his life. She testified that she was living in Gallatin on February 23, 1995, and that she was in the area of South Blakemore and Church Street during the early morning hours on that day. She was with a friend walking through an alley when she saw the Defendant who was holding either a long stick or a gun. The Defendant told her "move . . . go through there. There had been trouble." The object in the Defendant's hand was three (3) or three and one-half (3 ½) feet long and was either dark brown or black in color. She had not heard any gunshots fired prior to that time, nor did she see the victim that night. The Defendant appeared scared when he spoke to her. On cross-examination, Bennett admitted that she was under the influence of alcohol at the time of these events.

Brian Harris, patrolman with the Gallatin Police Department, was called out to Lock 4 Road at Town Creek on March 2, 1995, to locate evidence concerning the homicide. There is a creek under the roadway there, and when he arrived a woman was pointing to something in the water. He saw the object and retrieved it. It was a .22 caliber rifle with a string tied from it to a rock which prevented the rifle from going downstream.

Stanley Hilgadiack, a detective with the Gallatin Police Department, was called to investigate the scene of the victim's homicide. Detective Hilgadiack first went to Sumner Regional Medical Center where he saw the body of the victim and took photographs. He observed several injuries to the victim, including a

bullet wound below and to the left of the victim's navel, two (2) bullet entries into his side and two (2) more entries in his back and left sides. After his investigation at the hospital, Hilgadiack began to seek out witnesses involved in the shooting. The Defendant immediately became a suspect. The Defendant was located in Indianapolis, Indiana, and he was interviewed by telephone on February 24, 1995. During this phone conversation, the Defendant denied having any knowledge or involvement whatsoever regarding the homicide.

On March 9, 1995, Hilgadiack asked the Defendant and his brother to come to the police department for an interview. During the course of this interview, the Defendant stated that he did not shoot the victim and denied having any knowledge of who shot him. Again, on March 14, 1995, the Defendant was interviewed after two other individuals had advised Hilgadiack that Defendant was the one who shot and killed the victim. During this interview, Defendant advised Hilgadiack that he was the only one who knew what happened the night of February 23, 1995. He admitted to shooting the victim, and agreed to allow Hilgadiack to record his statement. The tape recording of the Defendant's statement was played to the jury. After Defendant gave the statement, a warrant was issued for his arrest on the charge of first-degree murder.

In his statement on March 14, 1995, the Defendant acknowledged that on the night of the homicide, he and friends went to a house belonging to one Ella Jo following the shooting on "Magnolia." The victim was seen "snooping up" behind Ella Jo's house. Defendant was watching the victim and claimed that the victim started shooting at another house. Defendant then retrieved the .22 caliber rifle which he had previously thrown on the ground because police had

-7-

arrived in the neighborhood, and shot at the victim who was approximately fifty (50) yards away. Defendant was not sure whether or not he hit the victim at that time. Ella Jo was scared because of the shooting and would not let the Defendant and his friends back inside. He stated that the victim ran in one direction while Defendant ran in another direction.

Defendant admitted that he was "stooped down" between a house and a shed hiding when he saw two women. He told them to go on because they had been shooting and the police were in the area. When Defendant heard footsteps coming in his direction, he peeped around a corner of the building, and saw the victim and immediately shot him. Defendant claimed the necessity of self-defense in his statement by explaining that if he had run, the victim would have shot him in the back. The Defendant stated that he immediately ran down an alley and placed the .22 caliber rifle behind a friend's house. Defendant denied that he was hiding in order to ambush the victim, instead claiming that he was hiding from the police. He also claimed that the victim had been shooting at him and his friends previously that evening. When asked if the victim had fired his weapon at him prior to the fatal shots being fired, the Defendant stated "I, I didn't give him a chance to."

Immediately prior to giving the tape recorded statement, Defendant had spoken to Detective Hilgadiack. Detective Hilgadiack further testified that the Defendant and the victim had been involved in a "shoot out" earlier in the evening prior to the homicide.

Tommy Heflin, assigned to the Firearms Identification section of the Forensic Services Crime Laboratory of the Tennessee Bureau of Investigation, examined the semi-automatic rifle used by the Defendant. The rifle was functional for shooting, and its safety features were functional as well. Heflin also examined the six shell casings found at the scene of the homicide and determined that they were fired from this particular rifle. He examined the bullets removed from the body of the victim and found that while each bullet had been fired from the same rifle, it was difficult to match these consistently to the rifle in evidence because it had a significant amount of rust due to being submerged in water. Heflin also examined the shotgun found with the victim, and he determined that it was a "single shot" shotgun, meaning that it can only be loaded with one shell. Each time the shotgun is fired, another shell has to be manually loaded into the chamber. This shotgun was also functional.

Dr. Charles Harlan performed the autopsy on the victim. Harlan identified pictures taken of the victim in which several gunshot wounds were visible. Harlan testified that all of the wounds occurred within minutes of each other. A total of six (6) bullets hit the victim. Three (3) of the gunshot wounds damaged internal structures, namely the liver, the right lung, spleen and stomach. Each of these three (3) wounds, in and of themselves, could have caused the victim's death. The death would have occurred within five (5) to ten (10) minutes following the shooting. None of the wounds had any "stippling" effect to the body as there was no injury to the skin. This indicated that the distance from the muzzle of the gun to the skin was greater than twenty-four (24) inches. Also, the absence of powder indicated that these gunshot wounds were distant gunshot wounds.

There was a presence of alcohol and drugs in the victim's body, but neither affected the results of the findings as to the victim's cause of death.

The Defendant did not present any proof at trial.

At the time of this offense, first degree murder required proof of the "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991). A death caused by the intentional act of another is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). To raise the offense to first degree murder, the State must prove premeditation and deliberation. Id. Premeditation necessitates "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991)(repealed July 1, 1995). This includes instances of homicide committed by poison or lying in wait, and requires a previously formed design or intent to kill. Id. Deliberation is defined as a "cool purpose . . . formed in the absence of passion." Brown, 836 S.W.2d at 539 (citations and internal quotations omitted). Some period of reflection, during which the "mind is free from the influence of excitement" is required for deliberation. Id. at 540. Both the elements of premeditation and deliberation are jury questions which may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).

There is sufficient proof in the record to support the conviction. Reviewed in the light most favorable to the State, the evidence in this case reflected that Defendant and victim had been involved in a shoot out in the neighborhood some one and one-half (1½) to two (2) hours prior to the homicide. The Defendant

knew that police officers were in the area, as evidenced by his statement that he was hiding from the police just prior to the fatal shooting. However, he did not seek the assistance of the police. He had earlier thrown down his rifle when the police first arrived in the neighborhood. When he later observed the victim "snooping up" behind a house, he retrieved his previously discarded rifle and shot at the victim who was approximately fifty (50) yards away. The proof indicates that these shots missed the victim. Defendant then hid himself, lying in wait for the victim, and when he observed the victim walking nearby he immediately fired at least six (6) shots which hit the victim. The jury could reasonably have inferred from Defendant's actions, as well as his warning to the two women who passed nearby to leave the area because there had been trouble, that Defendant was acting with premeditation and with deliberation, having a cool purpose. Defendant's actions in running from the scene, hiding the rifle, and leaving the State of Tennessee after the shooting, while not necessarily proof of premeditation and deliberation, discredited his theory of self-defense as set forth in his statement to police. State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

Having found that there were sufficient facts to support the conviction for premeditated and deliberate first degree murder, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:

-11-

_____
GARY R. WADE, Judge

_____
J. CURWOOD WITT, JR., Judge